UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Holding a Criminal Term

Grand Jury Sworn in on June 14, 2024

| | |
|---|---|
| UNITED STATES OF AMERICA, | CRIMINAL NO. |
| | VIOLATION: |
| v. | 15 U.S.C. §§ 78j(b) & 78ff; 17 C.F.R. § 240.10b-5; 18 U.S.C. § 2 (Securities Fraud) |
| BOBBY SHUMAKE JAPHIA, also known as "Robert Samuel Shumake, Jr.," also known as "Robert Japhia," also known as "Shaman Bobby Shu," | 18 U.S.C. § 1512(c)(1) (Obstruction) |
| Defendant. | FORFEITURE: 18 U.S.C. § 981(a)(1)(C), 21 U.S.C. § 853(p), 28 U.S.C. § 2461(c) |

**INDICTMENT**

The Grand Jury charges that:

**General Allegations**

At all times material to this Indictment, unless otherwise specified:

1.     Minerco, Inc. ("Minerco") was a Nevada Corporation formed in and around 2007. Minerco was a penny stock that traded publicly under the stock symbol MINE on OTC Markets, Inc. Beginning in or around January 2020, Minerco purported publicly to be in the business of developing, marketing, and distributing psilocybin mushrooms, also known as magic mushrooms or psychedelic mushrooms. Minerco shareholders lived throughout the United States, including in the District of Columbia.

2.     The defendant, BOBBY SHUMAKE JAPHIA, also known as "Robert Samuel Shumake, Jr.," "Robert Japhia," and "Shaman Bobby Shu" ("SHUMAKE"), was a resident of

1

Michigan who controlled all aspects of Minerco.  On or about December 20, 2017, in Michigan's Sixth Judicial Circuit Court, SHUMAKE pleaded guilty to two misdemeanor criminal violations of the Michigan Credit Services Protection Act and, on behalf of a mortgage audit business, pleaded guilty to two felony counts of obtaining money by false pretenses over $1,000 and thirteen misdemeanor violations of the Michigan Credit Services Protection Act.  Then, on or about January 31, 2018, SHUMAKE was sentenced to 18 months' probation.

3.     JULIUS MAKIRI JENGE resided in Virginia and Maryland, and in or around October 2019, he began holding himself out as the President and Chief Executive Officer of Minerco.

4.     Co-Schemer-1 was a resident of California who operated an investor relations and corporate communications firm.

5.     Co-Schemer-2 was a Canadian citizen who resided in and around Calgary, Alberta, Canada.

6.     Co-Schemer-3 was a Canadian citizen who resided in and around Edmonton, Alberta, Canada.

7.     Co-Schemer-4 was a Canadian citizen who resided in Turkey.

8.     Individual-1 was a resident of Georgia and SHUMAKE's former romantic partner.

9.     Company-1 was organized in the United Arab Emirates as a limited liability company.

10.     Bank-1 was a financial institution headquartered in the Bahamas.

11.     Cryptocurrency Brokerage-1 was a digital assets trading, exchange, and custodian services company headquartered in the United States that also had an office in Canada.

12.     Valuation Company-1 offered an online software tool for businesses to generate

2

valuation reports.

Relevant Terms

13.     "Penny stocks" referred to relatively low-priced stocks of publicly traded companies.

14.     The "Over-the-Counter" securities market was the market for securities not listed on a notable exchange, such as the New York Stock Exchange.

15.     OTC Markets, Inc. was an inter-dealer quotation service that provided quotations, prices, and financial information for certain Over-the-Counter securities.

16.     A "transfer agent" referred to an individual or entity assigned by an issuer of stock to maintain records of investors, account balances, and transactions.

17.     A "nominee" referred to a person or firm into whose name securities or other properties were transferred in order to facilitate transactions, while concealing the actual owner.

18.     Generally, a "pump-and-dump" referred to a form of fraud where individuals manipulate demand for a stock and the stock's price, and then sell their shares of that stock to the public at an artificially high price. The first step in a "pump-and-dump" was for the wrongdoers to gain control over a publicly traded company and free-trading shares in the company. After acquiring control of a company and free-trading shares in the company, the wrongdoers "pump" the stock's price by (among other things) disseminating false and misleading information that makes the company appear to be more valuable than it is and artificially increases demand for the company's stock. After fraudulently "pumping up" the price of a stock, wrongdoers "dump" their shares by selling them to unwitting investors.

19.     The U.S. Securities and Exchange Commission ("SEC") was a federal government agency authorized by law to investigate and enforce federal securities law violations.

3

20.     The Financial Industry Regulatory Authority ("FINRA") was a not-for-profit self-regulatory organization for the securities industry.

## COUNT 1
### Securities Fraud
### (15 U.S.C. §§ 78j(b); 78ff(a); 17 C.F.R. § 240.10b-5; 18 U.S.C. § 2)

21.     Paragraphs 1 through 20 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

22.     From at least in or around October 2019 through at least in or around October 2021, in the District of Columbia, and elsewhere, the defendant, SHUMAKE, together with others known and unknown to the Grand Jury, each aiding and abetting the others, did knowingly and willfully, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails and facilities of national securities exchanges, in connection with the purchase and sale of securities, use and employ, and cause others to use and employ, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5 by: (a) employing, and causing others to employ, devices, schemes, and artifices to defraud; (b) making, and causing others to make, untrue statements of material fact and omitting to state, and causing others to omit to state, material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging, and causing others to engage, in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, including members of the investing public and sellers and purchasers of the securities in Minerco, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5, and Title 18, United States Code, Section 2.

## PURPOSE OF THE SCHEME AND ARTIFICE

23.     It was the purpose of the scheme and artifice for SHUMAKE, who devised and organized the scheme, to artificially and fraudulently increase and maintain the share price of, and demand for, Minerco's securities to unjustly enrich himself and to conceal the scheme by: (a) issuing and causing to be issued materially false and misleading statements to the public relating to Minerco; (b) concealing material facts from the investing public; and (c) concealing the scheme from regulators, law enforcement, and the investing public.

## MANNER AND MEANS OF THE SCHEME AND ARTIFICE

24.     In furtherance of the scheme, SHUMAKE and others known and unknown, used the following manner and means, among others:

a.   SHUMAKE and JENGE took control of Minerco in late-2019, after the company, which had previously traded on OTC Markets, had been dormant for several years;

b.   SHUMAKE covertly acquired one billion Minerco shares by placing the shares in the name of a nominee shareholder, Individual-1, who was SHUMAKE's then-romantic partner, when in fact, SHUMAKE controlled the shares;

c.   SHUMAKE, JENGE, and Co-Schemer-1 concealed SHUMAKE's involvement with Minerco because of SHUMAKE's past criminal history and the negative news articles available to the public about him;

d.   SHUMAKE, JENGE, and Co-Schemer-1 caused positive press releases about Minerco to be issued to the public, at least some of which contained materially false and misleading information in an effort to artificially increase the share price of, and demand for, Minerco's securities;

e.   SHUMAKE made false and misleading statements to FINRA investigators to conceal

the scheme;

f.   SHUMAKE used an alias to promote Minerco on an investor message board;

g.   SHUMAKE, Co-Schemer-2, Co-Schemer-3, Co-Schemer-4, and Company-1 caused nearly one billion Minerco shares to be sold at artificially inflated prices for their own personal gain and to the detriment of the investing public;

h.   SHUMAKE destroyed evidence related to Minerco to obstruct an SEC official proceeding and to conceal his scheme.

**SHUMAKE Gained Control of Minerco in Late-2019**

25.    Minerco purported to have a series of different business purposes since being formed in or around 2007.  Initially it purported to focus on oil and natural gas, then renewable energy, and then the beverage industry.  Between at least approximately 2014 and 2019, Minerco purported to be focused on the beverage industry.

26.    In or around July 2019, SHUMAKE contacted the former CEO of Minerco to inquire whether Minerco was for sale, and SHUMAKE negotiated the purchase of a controlling interest in Minerco.  At the time, Minerco traded at approximately $0.0001 per share and had little, if any, operations.

27.    In or around October 2019, SHUMAKE recruited JENGE to act as Minerco's nominee CEO.  SHUMAKE recruited and installed JENGE as Minerco's CEO because, among other things, SHUMAKE knew that if SHUMAKE's name were publicly associated with Minerco, the company would be less attractive to investors, it would be difficult to increase Minerco's share price through a pump and dump scheme, and Minerco would face increased scrutiny.

28.    On or about October 25, 2019, SHUMAKE caused CBD Securities Acquisition LLC to acquire a controlling number of Class A preferred shares in Minerco pursuant to a stock

purchase agreement.  Then, on or about October 30, 2019, Minerco's transfer agent issued 2 million Class A preferred shares to CBD Securities Acquisition LLC.  This issuance represented approximately 93% of Minerco's Class A preferred shares.

29.     SHUMAKE concealed his role with Minerco even though he controlled all aspects of Minerco and ran its day-to-day operations.  For example, SHUMAKE made corporate strategy decisions on behalf of Minerco, engaged in negotiations with third parties on behalf of Minerco, paid or directed others to pay money on behalf of Minerco, and drafted and directed others to draft press releases for Minerco.  As it related to Minerco, JENGE generally acted only at the direction of SHUMAKE, and JENGE was subordinate to SHUMAKE.

30.     SHUMAKE concealed his role at Minerco from the public because, among other things, in or around December 2017 SHUMAKE pleaded guilty to two misdemeanor criminal violations in connection with a mortgage fraud scheme and negative news articles about SHUMAKE were available on the internet, including, among others:

    a.   An article dated March 16, 2017 titled: "Hall of Shame: Robert Shumake – big shot busted" that stated, among other things, "according to a police report, last June Robert Shumake was caught with several pounds of marijuana and $121,000 in cash outside a Shasta County motel."

    b.   An article dated January 25, 2018 titled: "Oakland County businessman Robert Shumake behind bars," that stated that, among other things, "An Oakland County businessman is behind bars tonight.  He was out on bond but the judge says he violated the conditions that bond and the judge locked him up."

    c.   An article dated March 1, 2018 titled: "Judge calls businessman Robert Shumake 'a criminal'" that stated, among other things, that SHUMAKE "pleaded guilty to two

misdemeanor violations of the credit services protection act while his business . . . pleaded guilty to two felony counts of obtaining money by false pretenses and 13 misdemeanors."

d. An article dated December 28, 2018, that reported that more than $250,000 in cash belonging to SHUMAKE was seized at a Charlotte, North Carolina airport from "a courier who said he had been hired by Shumake" and that "federal officials say the currency was shipped in denominations and packaged in a way that was 'consistent with drug trafficking.'"

### SHUMAKE Covertly Obtained One Billion Minerco Shares

31.    Beginning in or around January 2020, SHUMAKE covertly acquired one billion Minerco shares by placing them under the purported control of a nominee, Individual-1.

32.    On or about January 22, 2020, at SHUMAKE's request, JENGE signed a resolution authorizing Minerco to issue one billion Minerco shares to Jameson Holdings LLC, which was a Virginia Corporation that SHUMAKE and JENGE caused to be formed that was organized under Individual-1's name.  Then, on or about February 26, 2020, SHUMAKE caused a transfer agent to issue one billion Minerco shares to Jameson Holdings LLC.  SHUMAKE caused the one billion Minerco shares to be issued to Jameson Holdings LLC to conceal the fact that he controlled the shares and that SHUMAKE was, in fact, the beneficial owner of the shares.

33.    Over time, SHUMAKE caused the one billion Minerco shares to be held in the name of other nominees, such as Individual-1 and Company-1.  However, SHUMAKE, at all relevant times, exercised control over these shares and was the beneficial owner of the shares.

## SHUMAKE Caused False and Misleading Press Releases to be Issued

34.     As part of the scheme, SHUMAKE made or caused to be made materially false and misleading statements to the public in an effort to artificially inflate the share price of, and demand for, Minerco stock with the assistance of JENGE, Co-Schemer-1, and others.  These statements were transmitted to the public through the internet, including to the District of Columbia, where they were received, using means and instrumentalities of interstate commerce, including wires in interstate commerce.  For example:

a.   On or about January 16, 2020, SHUMAKE caused a materially false and misleading press release to be issued to the public, including to the District of Columbia, with the headline: "Investment Firm Acquires Minerco, Announces Launch of Psilicybin, 'Magic Mushroom' Business Model[.]"  The press release, among other things, falsely stated that Minerco "has been acquired by a specialized investment firm" and that it "was acquired by psilocybin research and investment firm[.]"  In truth, the company that acquired Minerco lacked any operations, was merely a holding company for Minerco shares, and had no specialized experience.

b.   On or about January 4, 2021, SHUMAKE caused a materially false and misleading press release to be issued to the public, including to the District of Columbia, about a joint venture agreement between Minerco and another company that, among other things, falsely stated that: "through the [joint venture agreement] . . . Minerco will inherit multiple cannabis licenses to grow, process, extract cannabis as well as psilocybin[.]"   In truth, while Minerco entered into a joint venture agreement with another company, there was never an agreement that Minerco would inherit licenses.

c.   On or about January 19, 2021, SHUMAKE caused a materially false and misleading

9

press release to be issued to the public, including to the District of Columbia, titled: "Minerco Inc. the Magic Mushroom Company Receives 1B Valuation Pre-Money Business Valuation from [Valuation Company-1] . . . This Valuation was computed based upon financial projections from the business model." Valuation Company-1 offered an online software tool that instantly calculated the purported value of a business using several methodologies based on information inputted by the user. However, this press release was false and misleading because although SHUMAKE generated a report from Valuation Company-1 that stated Minerco had a valuation of approximately one billion dollars, SHUMAKE created the report by inputting financial projections that were not based on Minerco's true financial condition.

d. On or about March 14, 2021, SHUMAKE caused a materially false and misleading press release to be issued to the public, including to the District of Columbia, that among other things, falsely stated that: "Minerco . . . announced today that they have acquired . . . a white label CBD company" and that "[t]his strategic purchase includes crucial equipment, increasing microdosed psilocybin tablet production capacity by 1 million units daily." In truth, while Minerco acquired a CBD company, the acquisition did not include any equipment.

### SHUMAKE Caused False and Misleading Statements and Reports to be Made to OTC Markets

35.     To conceal his identity from OTC Markets, on or about January 8, 2021, SHUMAKE instructed JENGE to inform OTC Markets that JENGE was out of the country and that OTC Markets should add SHUMAKE's email address, robert@minercoinc.com, to correspondence. SHUMAKE also instructed JENGE to identify SHUMAKE only by his then-first name and middle name, "Robert Samuel" and not by the full name he regularly used, which was

"Robert Shumake."   Then, on or about the same day, JENGE emailed these instructions to OTC Markets.

36.     SHUMAKE also caused false and misleading Minerco public reports to be filed with OTC Markets and made available to the public that concealed his involvement with Minerco. For example, in quarterly reports filed between approximately April 2020 to May 2021, Minerco's filings omitted any reference to SHUMAKE and disclosed JENGE as the CEO and only officer, director, or control person even though SHUMAKE, in fact, controlled all aspects of Minerco.

### SHUMAKE Misled FINRA Investigators

37.     To further conceal the scheme, on or about January 8, 2021, SHUMAKE made materially false and misleading statements to investigators from FINRA's Fraud Surveillance section during a telephone interview.   At the time, FINRA was investigating potentially fraudulent activity related to Minerco.   For example, during the interview, SHUMAKE falsely stated that:

a. JENGE brought SHUMAKE on board to help organize the day-to-day operations of Minerco.   In truth, however, SHUMAKE recruited JENGE to serve as the nominee CEO of Minerco.

b. SHUMAKE was not aware of any specific individuals or entities trading Minerco stock.   In truth, however, SHUMAKE knew about trading in Minerco.   For example, on or about December 16, 2020—a few weeks before being interviewed by FINRA— SHUMAKE texted Individual-1: "You might want to check your MINE stock today" and Individual-1 responded: "I sold everything last week."

c. SHUMAKE was not aware of any promotional campaigns regarding Minerco stock. In truth, however, SHUMAKE hired a company to promote Minerco via email, text messages, and social media.

## SHUMAKE Used an Alias to Promote Minerco on an Investor Message Board

38.     Investor Message Board-1 was a public website and message board service used by investors and potential investors in publicly traded stocks.

39.     In or around November 2018, SHUMAKE created an account with Investor Message Board-1 using the alias, "Burntcheeze."   SHUMAKE promoted Minerco on Investor Message Board-1 under the alias "Burntcheeze," and provided the false and misleading impression that he was not affiliated with Minerco and was an independent investor.   For example, SHUMAKE posted:

   a.   On or about November 20, 2019: "Look what I found" with a link to Minerco's website.

   b.   On or about December 3, 2020, in response to a post suggesting that Minerco was a scam, SHUMAKE posted: "I am a new guy investing . . . Can you please take down the info about company being a scam."

   c.   On or about December 19, 2020, in response to a post about Minerco's plans to hold an investor call, posted: "a brilliant strategy for MINE[.]"

   d.   On or about December 29, 2020: "Looks like they updated there [sic] website what a major improvement" with a link to Minerco's website.

   e.   On or about January 14, 2021 in response to a post stating,: "this is a pump attempt by the company," posted "Who buys a company to simply pump the stock.  Doesn't make since [sic]."

40.     SHUMAKE also recruited others to promote Minerco on internet message boards to provide the false and misleading impression that the public had a favorable view of Minerco. For example, on or about June 7, 2020, SHUMAKE texted an individual: "You need to post positive things about the companies I give u.  Needs 200 post daily."  When this individual reported

difficulty posting from multiple accounts, or about June 11, 2020, SHUMAKE replied that: "you need multiple ip addresses" because internet messages boards can use internet protocol addresses to help determine whether the same individual is posting from multiple accounts.

### SHUMAKE Sold Minerco Stock at an Artificially Inflated Price

41.     In or around 2020, after SHUMAKE had difficulty depositing and selling his one billion Minerco shares with any broker, SHUMAKE contacted Co-Schemer-3 for assistance. Ultimately, Co-Schemer-2, Co-Schemer-3, Co-Schemer-4, and Company-1 agreed to assist SHUMAKE with selling the one billion Minerco shares in exchange for a share of the proceeds of the sale.

42.     By in or around February 2021, with the assistance of Co-Schemer-2, Co-Schemer-3, Co-Schemer-4, and Company-1, SHUMAKE's one billion Minerco shares were deposited into an account at Bank-1 headquartered in the Bahamas.

43.     Generally, to sell the Minerco shares, SHUMAKE provided instructions on the quantity, price, and timing of Minerco shares to be sold to Co-Schemer-3, who communicated the instructions to Co-Schemer-2. Co-Schemer-2 then communicated the instructions to Co-Schemer-4, and Co-Schemer-4 then communicated the instructions to Company-1. For example:

a. SHUMAKE texted Co-Schemer-3 on or about February 10, 2021: "Hey I think the markwt [sic] can absorb a higher number," on or about February 11, 2021, "Let's get another 100m out at 1. 99," and on or about February 12, 2021: "Have them hold first few hrs so it can breathe. My tweet was strong 600 retweets[.]"

b. SHUMAKE texted Co-Schemer-2 on or about February 12, 2021: "Let's hold for the first 2hrs. So it can breath," and on or about April 18, 2021, SHUMAKE texted Co-Schemer-2: "Move another 100m anywhere in the 5s tomm[.]"

44.     Between on or about February 10, 2021 and May 26, 2021 at SHUMAKE's direction, Co-Schemer-2, Co-Schemer-3, Co-Schemer-4, and Company-1 worked together to sell approximately 928 million of the one billion Minerco shares SHUMAKE controlled at artificially inflated prices for a total of approximately $8.4 million.

45.     The sale of SHUMAKE's Minerco shares stopped on or about May 26, 2021 because that day the SEC issued an order that halted trading in Minerco between May 27, 2021 and June 10, 2021.  The SEC's order stated: "the public interest and the protection of investors require a suspension in the trading of the securities of Minerco, Inc. . . . because of questions and concerns regarding the adequacy and accuracy of information about the Company in the marketplace and unusual and unexplained activity affecting the market for its securities."

46.     Between in or around February 2021 and August 2021, approximately $7 million from the sale of SHUMAKE's Minerco shares was transferred from Bank-1 to Cryptocurrency Exchange-1.  SHUMAKE then caused himself or entities under his control to receive at least $2.5 million from the sale of Minerco shares.  The remaining funds were distributed between Co-Schemer-2, Co-Schemer-3, Co-Schemer-4, Company-1, and others.

47.     During SHUMAKE's scheme to defraud, the share price of, and demand for, Minerco's securities increased.  In addition, as a result of SHUMAKE's scheme to defraud, Minerco investors lost millions of dollars.

48.     Having executed the pump and dump scheme, SHUMAKE abandoned Minerco. Minerco made no disclosures, such as quarterly or annual reports, after in or around May 2021. Moreover, although Minerco issued numerous press releases beginning in or around January 2020, Minerco did not issue any press releases after in or around June 2021.

## SHUMAKE Destroyed Evidence

49.     On or about May 28, 2021, as authorized by law, the SEC issued an order in *In the Matter of Minerco, Inc.* authorizing an investigation into potential violations of various federal securities laws related to Minerco.  The order empowered certain SEC staff to "administer oaths and affirmations, subpoena witnesses, compel their attendance, take evidence, and require the production of any books, papers, correspondence, memoranda, or other records deemed relevant or material to the inquiry, and to perform all other duties in connection therewith as prescribed by law."  The SEC investigation into Minerco was pending in Washington, DC and conducted from the SEC's Washington, DC office.

50.     As part of its investigation, on or about October 1, 2021, the SEC issued an administrative subpoena to JENGE for documents related to Minerco.

51.     After learning of the SEC's investigation into Minerco, SHUMAKE conducted internet searches related to deleting records and then deleted and destroyed records that were relevant to the SEC, including by, among other things:

a.  On or about October 5, 2021, SHUMAKE conducted internet searches, such as: "how to delete email account on iphone" and "how to delete email domain name."

b.  On or about October 5, 2021, SHUMAKE deleted the contents of at least one Minerco email account, which SHUMAKE used to conduct Minerco business, including, among others: robert@minercoinc.com.

52.     SHUMAKE had also previously conducted internet searches and visited websites to research how to destroy evidence immediately after the SEC halted trading in Minerco on or about May 26, 2021.  For example, on or about May 27, 2021, SHUMAKE conducted internet searches, such as: "How far back can you subpoena text messages," "deleting text messages for

subpoena," and visited an internet article titled: "Cell Phone Forensics: Powerful Tools Wielded by Federal Investigators" and another internet article titled "Smash it, shred it, wipe it . . . guide to destroying text messages," which stated, among other things: "curious on how to permanently erase your scandalous text conversations? Here's some pro tips for when simply hitting delete is not enough[.]"

## COUNT 2
### Obstruction
### (18 U.S.C. § 1512(c)(1))

53.    Paragraphs 1 through 20 and 23 through 52 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

54.    In or around October 2021, in the District of Columbia and elsewhere, SHUMAKE, corruptly altered, destroyed, mutilated, and concealed a record, document, and other object, and attempted to do so, with the intent to impair the object's integrity and availability for use in an official proceeding, to wit: a pending SEC investigation, which was a proceeding before a Federal Government agency authorized by law, and a foreseeable proceeding brought by the SEC before a court of the United States, by destroying and attempting to destroy the contents of at least one Minerco email account, namely robert@minercoinc.com.

## FORFEITURE ALLEGATIONS

55.    The allegations contained in Counts One and Two of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

56.    Upon conviction of any of the offenses alleged in Counts One and Two, the defendant shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or

personal, which constitutes or is derived from proceeds traceable to the offenses.  The property to

be forfeited includes, but is not limited to a sum of money equal to the proceeds derived from the

offenses of conviction.

      57.    If any of the property described above, as a result of any act or omission of the

defendant:

      a.      cannot be located upon the exercise of due diligence;

      b.      has been transferred or sold to, or deposited with, a third party;

      c.      has been placed beyond the jurisdiction of the court;

      d.      has been substantially diminished in value; or

      e.      has been commingled with other property which cannot be divided without
            difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title

21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section

2461(c).

A TRUE BILL.

_____
FOREPERSON

Date: _____

UNITED STATES OF AMERICA

GLENN S. LEON
Chief, Fraud Section
Criminal Division, U.S. Department of Justice

By: _____
KYLE CRAWFORD
Trial Attorney, Fraud Section
Criminal Division, U.S. Department of Justice