USAO File Number:  2023R01214    AUSA:  John K. Neal    Telephone: (313) 226-9644

AO 106 (Rev. 04/10)  Application for a Search Warrant    Special Agent:  George Adams    Telephone: (202) 860-8679

# UNITED STATES DISTRICT COURT
### for the
Eastern District of Michigan

Case: 4:23−mc−51569-2
Assigned To : Behm, F. Kay
Assign. Date : 10/31/2023
Description: RE: SEALED
MATTER
(EOB)

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

INFORMATION ASSOCIATED WITH TWO
ACCOUNTS STORED AT PREMISES CONTROLLED
BY GOOGLE LLC

)
)
)
)
)
)

Case No.  -2

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See ATTACHMENT A-2.

located in the          Eastern          District of          Michigan          , there is now concealed *(identify the person or describe the property to be seized)*:

See ATTACHMENT B-1.

I hereby certify that the foregoing is a certified copy of the original on file in this office.

**Clerk, U.S. District Court
Eastern District of Michigan**

By:     s/Eddrey Butts
          Deputy

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- [x] evidence of a crime;
- [ ] contraband, fruits of crime, or other items illegally possessed;
- [x] property designed for use, intended for use, or used in committing a crime;
- [ ] a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1343; 18 U.S.C. § 1956 | Wire Fraud, Money Laundering |
| 15 U.S.C. § 78j(b) | Securities Fraud |

The application is based on these facts:

See attached AFFIDAVIT.

- [x] Continued on the attached sheet.
- [ ] Delayed notice          days (give exact ending date if more than 30 days:          ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

George Adams- Special Agent
*Printed name and title*

Sworn to before me and signed in my presence and/or by reliable electronic means.

Date:     10/31/2023

*Judge's signature*

City and state:  Flint, MI

Curtis Ivy, Jr.,          U. S. Magistrate Judge
*Printed name and title*

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| **IN THE MATTER OF THE SEARCH OF:** | Case: 4:23−mc−51569-2<br>Assigned To : Behm, F. Kay<br>Assign. Date : 10/31/2023<br>Description: RE: SEALED MATTER (EOB) |
| **YAHOO INC. FOR INFORMATION ASSOCIATED WITH ONE ACCOUNT** | |
| **GOOGLE LLC FOR INFORMATION ASSOCIATED WITH TWO ACCOUNTS** | |
| **MICROSOFT CORPORATION USA FOR INFORMATION ASSOCIATED WITH ONE ACCOUNT** | **No.**<br><br>**Filed Under Seal** |
| **APPLE INC. FOR INFORMATION ASSOCIATED WITH ONE ACCOUNT** | |
| **X CORP. FOR INFORMATION ASSOCIATED WITH ONE ACCOUNT** | |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR SEARCH WARRANTS

I, George Adams, Special Agent with the Securities and Exchange Commission, Office of the Inspector General, being duly sworn, deposes and states:

### INTRODUCTION AND AGENT BACKGROUND

1.      I am a Senior Special Agent with the U.S. Securities and Exchange

Commission, Office of Inspector General ("SEC-OIG") and have been since February 2022.  I have over 26 years of combined civilian law enforcement experience at the local, state, and federal levels.  I have 20 years of experience as a federal criminal investigator and have attended and completed basic and advanced training in conducting investigations of white collar crimes and complex fraud schemes involving wire, mail and bank fraud, conspiracy, money laundering, and obstruction of justice.  My training and experience includes conducting investigations involving electronic methods of communication that include the use of websites, emails, cellular phones, texts, social media, and encrypted messaging applications that are often used in furtherance of the criminal activity involved.  I have participated in the execution of search warrants involving electronic evidence. I have also completed courses in the Georgetown University Law Center's Securities and Financial Regulation certificate program that includes advanced Securities Fraud Investigations and Securities Litigation courses.  I also have extensive knowledge of SEC policies and procedures by virtue of my current position.

2.    I make this affidavit in support of applications for search warrants for information associated with:

a.  ████████@yahoo.com (SUBJECT ACCOUNT 1), which is stored at premises controlled by Yahoo Inc., an electronic communications services provider and/or remote computing services provider headquartered at 770 Broadway, 9th Floor, New York.

b.  robshumake@gmail.com        (SUBJECT        ACCOUNT        2)        and

juliusjenge@gmail.com (SUBJECT ACCOUNT 3), which is stored at premises controlled by Google LLC., an electronic communications services provider and/or remote computing services provider headquartered at 1600 Amphitheatre Parkway, Mountain View, CA.

c. robert@minercoinc.com (SUBJECT ACCOUNT 4), which is stored at premises controlled by Microsoft Corporation, USA headquartered at 1 Microsoft Way, Redmond, CA.[1]

d. robshumake@icloud.com (SUBJECT ACCOUNT 5), which is stored at premises controlled by Apple Inc. headquartered at One Apple Park Way, Cupertino, CA.

e. @MinercoInc (SUBJECT ACCOUNT 6), which is stored at premises controlled by X Corp. (formerly Twitter) headquartered at 1355 Market Street, Suite 900, San Francisco, CA.

3. The information to be searched is described in the following paragraphs and in Attachments A-1, A-2, A-3, A-4, A-5. This affidavit is made in support of an application for search warrants under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Yahoo Inc., Google LLC, Microsoft Corporation USA, and Apple Inc., (together, the SUBJECT EMAIL PROVIDERS) and X Corp. to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B-1 & B-2. Upon receipt of the information described in Section I of Attachment B-1 & B-2, government-authorized persons will review that information to locate the items described in Section II of Attachment B-1 & B-2 using the procedures described in Section III of Attachment B-1 & B-2.

---

[1] According to records from GoDaddy, SUBJECT ACCOUNT 4 is hosted by Microsoft.

4.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant.  It does not set forth all of my knowledge, or the knowledge of others, about this matter.

5.      As described below, there is probable cause to believe that SUBJECT ACCOUNTS 1-6 were utilized in connection with a "pump and dump" fraud scheme on victim investors of the publicly traded stock in Minerco, Inc. and that a search of SUBJECT ACCOUNTS 1-6 will identify evidence, fruits, and instrumentalities of that scheme.  As described below, there is also probable cause to believe that SUBJECT ACCOUNTS 1 and 2 were utilized in connection with a fraudulent scheme targeting the Small Business Administration's Economic Injury Disaster Loan Program ("EIDL), a program providing funding to help small businesses recover from the impacts of the COVID-19 pandemic and that a search of SUBJECT ACCOUNTS 1 and 2 will identify evidence, fruits, and instrumentalities of that scheme.

## **JURISDICTION**

6.      This Court has jurisdiction to issue the proposed Order because it is "a court of competent jurisdiction," as defined in 18 U.S.C. § 2711.  *See* 18 U.S.C. § 2703(d).  Specifically, the Court is a district court of the United States that has

jurisdiction over the offenses being investigated. *See* 18 U.S.C. § 2711(3)(A)(i). As discussed further below, Robert Shumake resides in the Eastern District of Michigan.

## PROBABLE CAUSE

7.      Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of 18 U.S.C. § 1343 (Wire Fraud), § 1956 (Money Laundering), 15 U.S. Code § 78j(b), 17 C.F.R. § 240.10b-5 (Securities Fraud), and conspiracy to commit those offenses (the "Subject Offenses"), have been committed by Robert Shumake and Julius Jenge for engaging in a "pump and dump" fraud scheme on victim investors of the publicly traded stock in Minerco, Inc. Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is also probable cause to believe that violations of 18 U.S.C. § 1343 (Wire Fraud) have been committed by Robert Shumake for a fraudulent scheme targeting the Small Business Administration's EIDL program. There is also probable cause to search the information described in Attachment A-1, A-2, A-3, A-4, A-5 for evidence, instrumentalities, contraband, or fruits of these crimes further described in Attachment B-1 & B-2.

### Relevant Individuals and Entities

8.    Minerco, Inc. was a Nevada Corporation formed in and around 2007 according to Nevada Secretary of State records.  Minerco traded under the stock symbol MINE in the Over-the-Counter Markets ("OTC") rather than on a national securities exchange such as the NASDAQ stock market.  Stocks commonly known as "penny stocks" are often traded on OTC Markets.

9.    Julius Makiri Jenge ("Jenge"), 53, began holding himself out as the CEO of Minerco in or around November 2019.  Jenge has publicly reported that he was born and raised in Tanzania, although he is believed to have resided in Virginia, at times.

10.    Robert Samuel Shumake Jr. ("Shumake"), 55, resides in and around Detroit, Michigan.  In December 2017, Shumake pleaded guilty to two misdemeanor criminal violations of the Michigan Credit Service Protection Act and was sentenced to 18 months of probation in connection with a mortgage fraud scheme.  Shumake reported to the Financial Industry Regulatory Authority ("FINRA") that he was the Head of Business Development and Corporate Secretary for Minerco during a January 2021 interview.

11.    ███████████████, resides in Georgia.  According to a declaration ███ provided to the Securities and Exchange Commission in approximately January 2023, ("the ███ Declaration"), ███ met Shumake in approximately 2015, Shumake hired her to be his assistant, and between at least November 2018 and January 2021,

the two had a romantic relationship.

## Relevant Terms

12.    Penny stocks are stocks of publicly traded U.S. companies that have a low market capitalization.  Penny stocks are subject to price manipulation because they are thinly traded and subject to less regulatory scrutiny than stocks that trade on notable exchanges such as the NASDAQ.

13.    A "Transfer Agent" is a company assigned by an issuer of stock to maintain records of investors, account balances, and transactions.  A transfer agent, acting on the direction of the company issuing shares, issues and cancels stock certificates to reflect changes of ownership.

14.    Generally, a "pump-and-dump" is a form of fraud where the conspirators manipulate demand for a stock and the stock's price, and then sell their shares of that stock to the public at an artificially high price. The first step in a "pump-and-dump" is for the conspirators to gain control over a publicly traded company and that company's free-trading shares. This allows the conspirators to control the market for that company's stock. After acquiring control of a company and its free-trading shares, the conspirators will "pump" the stock's price by (among other things) disseminating false and misleading information that makes the company appear to be more valuable than it is.  After fraudulently "pumping up" the

price of a stock, the conspirators "dump" their shares by selling them to unwitting investors.

## Overview of the Minerco "Pump and Dump" Scheme

15.    The United States is investigating Shumake, Jenge, and other individuals for executing a "pump and dump" fraud scheme on victim investors of the publicly traded stock of Minerco.  The scheme had the following elements, among others: (1) Shumake and Jenge worked together to take control of Minerco in late-2019, a company that had previously traded on OTC Markets, but that had been dormant for several years; (2) Shumake and Jenge caused the issuance of 1 billion Minerco shares to a nominee shareholder, who was Shumake's then-romantic partner, ███ (3) Shumake and Jenge caused positive press releases about Minerco to be issued during the "pump" phase of the scheme, at least some of which contained materially false and misleading information in an effort to increase the share price of Minerco stock; (4) Shumake and Jenge concealed Shumake's involvement with Minerco to the public given Shumake's past criminal fraud convictions and multiple negative news stories about Shumake; (4) Shumake obtained over $2.5 million from the sale of Minerco stock during the "dump" phase of the scheme.

## Shumake and Jenge Takeover Minerco in Late-2019

16.    Minerco has purported to have a series of different business purposes since being formed in 2007.  According to SEC filings, initially its focus was on oil and natural gas, then renewable energy, and then the beverage industry.  Based on a review of public filings and Minerco social media, between at least approximately 2014 and 2019, Minerco publicly reported being focused on the beverage business. However, in public filings on OTC Markets, Minerco reported zero revenues between approximately July 2016 to April 2019.

17.    According to documents from OTC Markets, on or about February 12, 2019, the then-CEO of Minerco, ███████, emailed OTC Markets "to get Minerco (MINE) back up and running and current on OTC Markets."  It is my understanding that a company may attempt to become current with OTC Markets to make itself more attractive to potential purchasers.

18.    According to records from Minerco's Transfer Agent, on or about October 30, 2019, 2 million Minerco Class A Preferred shares were issued to CBD Securities Acquisition LLC, which represented approximately 93% of those shares. The Minerco shares were purportedly issued pursuant to an October 24, 2019 Stock Purchase Agreement between Minerco and CBD Securities Acquisition LLC.  The Agreement was signed in the name of Jenge on behalf of CBD Securities, LLC.

19.     In the year before executing the Stock Purchase Agreement, between October 2018 and October 2019, Minerco stock traded, on average, at approximately $0.0001 or 1/10,000th of a dollar.

20.     According to the ▮▮▮ Declaration: "In approximately October 2019, Shumake gave me a gift of $2,000 to deposit into my brokerage account and instructed me to buy stock of Minerco . . . with the money as an investment." According to records from ▮▮▮▮▮▮▮, between approximately October 23-30, 2019, ▮▮▮ purchased 20.2 million Minerco shares for approximately $2,000. Moreover, ▮▮▮▮▮@yahoo.com (SUBJECT ACCOUNT 1) is listed on account opening documents for ▮▮▮ ▮▮▮▮▮▮ account.

21.     On or about November 4, 2019, ▮▮▮▮▮▮, the then former CEO of Minerco, informed OTC Markets that "Minerco recently underwent a change in control" and copied the email address roberts@ebony.com, which is believed to belong to Shumake.

22.     According to documents from the Transfer Agent, on or about November 19, 2021, juliusjenge@gmail.com (SUBJECT ACCOUNT 3), emailed the Transfer Agent a corporate information sheet for Minerco that identified Jenge as the President, Secretary, and Officer of Minerco.

23.     According to the ▉ declaration, "Jenge told me that [Jenge] was the CEO of Minerco and that it was Shumake who offered him that job" and that "Jenge told me that Shumake controls Minerco[.]"

24.     Based on my knowledge and experience, individuals are sometimes interested in taking control of a mature "penny stock" company like Minerco to provide the appearance of legitimacy and longevity to the company even though the company has otherwise generated little to no revenue.

### Shumake Obtains 1 Billion Minerco Shares Through Nominees

25.     According to the ▉ declaration: "In approximately October 2019, Shumake told me that he was giving me as a gift the company, Jameson Holdings LLC . . . and one billion shares of Minerco stock that Jameson would own. Shumake directed me to sign papers on behalf of Jameson right away to complete the gift of Jameson and the shares . . . At Shumake's direction, I communicated with representatives of [the Transfer Agent], beginning in January 2020, to complete the acquisition of the one billion shares of Minerco stock. Shumake told me what to say to [the Transfer Agent] and how to answer their questions about the transaction[.]"

26.     According to records from the Transfer Agent, on or about February 26, 2020, Minerco issued 1 billion free trading shares to Jameson Holdings LLC. However, according to Virginia Secretary of State records, Jameson Holdings LLC was not formed until March 23, 2020—after Jameson Holdings received 1 billion

Minerco shares and Jenge is listed as the registered agent of Jameson Holdings.

27.     According to records from the Transfer Agent, on or about April 2, 2020 the Transfer Agent transferred 1 billion Minerco shares that were in the name of Jameson Holdings to ██ in response to a request from ████████@yahoo.com (SUBJECT ACCOUNT 1).  Moreover, according to the ██ Declaration, "In the spring of 2020, I met with Shumake personally when he was in Atlanta.  Shumake told me that the one billion shares of Minerco stock belonged to him[.]"

28.     According to the ██ Declaration, "[o]n approximately September 16, 2020, Shumake contacted me unexpectedly and told me that he wanted me to sign papers to transfer the one billion shares of Minerco stock to a company based in Dubai.  I was not involved in negotiating the transaction, but Shumake told me that he was 'getting rid of these shares for a clean Comp[a]ny.'  Shumake sent me documents identifying the purchaser as ████████████████ which was a company unknown to me.  I signed the documents because Shumake told me it would end my involvement."  Further, according to records from FINRA, on or about September 16, 2020, ██ signed a Stock Purchase Agreement on behalf of Jameson Holdings with ████████.  Under the Agreement, ████████ received 1 billion Minerco shares in exchange for 30% of the proceeds of the sale of the 1 billion Minerco shares.

29.     According to records from ████████ Bank, ████████, a

company incorporated in Dubai, opened a ▇▇▇▇▇ Bank account on or about October 9, 2020 and the signatory of the account is ▇▇▇▇▇, a Turkish citizen. Moreover, according to records from the Transfer Agent, on or about November 18, 2020, the Transfer Agent transferred 1 billion Minerco shares from ▇ to ▇▇ ▇▇ following a request from ▇▇▇▇@yahoo.com (SUBJECT ACCOUNT 1).

30.    According to WhatsApp messages from ▇▇ on or about November 19, 2020, ▇▇ texted Shumake: "I did all you wanted and now your [Minerco] shares stock should be good and done. I sent everything to [the Transfer Agent] and he received the payment he said he will transfer your stocks to the New guy."

31.    According to WhatsApp messages from ▇▇ on or about December 16, 2020, Shumake texted ▇▇ "As i said once I sell these shares I will pay you an additional fee.  I'm certain you will be happy."

32.    According to records from the Transfer Agent, on or about December 17, 2020, the Transfer Agent transferred 1 billion Minerco shares from ▇▇ ▇▇ to ▇▇▇▇ Bank located in the Bahamas.

33.    According to WhatsApp messages from ▇▇ on or about December 29, 2020, Shumake texted ▇▇ "Update. Stocks finally got approved today with in 2weeks [sic] you will receive payments weekly.  It won't be a lump can't flood the market[.]"

34.    According to text messages from ▮▮ on or about January 16, 2021, ▮▮ texted Shumake: "Everything that you did you never used your name, any of your kids name o[r] [your wife's] name but ▮▮▮▮ Why? Good night" and Shumake replied: "It would be perceived as **_illegal_**." (emphasis added).

35.    According to records from FINRA and ▮▮▮▮ Bank, between approximately February 10, 2021 and May 26, 2021, an account at ▮▮▮▮ Bank in the name of ▮▮▮▮, sold 930 million shares of Minerco for approximately $8.4 million.   And according to trading data from Bloomberg, on or about February 9, 2021, Minerco stock closed at $0.0158 up approximately 1.5 million percent from January 2, 2020.

36.    According to records from ▮▮▮▮ Bank and ▮▮▮▮, between approximately February 22, 2021 and March 30, 2021, ▮▮▮▮ transferred approximately $5.8 million from ▮▮▮▮ Bank to an account in the name of ▮▮▮▮ at ▮▮▮▮.  ▮▮▮▮ publicly describes itself as: "providing next generation blockchain-powered technologies for tokenization, trading, clearing, settlement, payment and safe-keeping of digital assets."

37.    According to records from ▮▮▮▮, ▮▮▮▮ transferred approximately $2.57 million to an ▮▮▮▮ account in the name of Shubox LLC between approximately February 26, 2021 and March 31, 2021 and Shumake opened the Shubox LLC account on or about February 22, 2021 with the email

address robshumake@gmail.com (SUBJECT ACCOUNT 2).  Moreover, according

to records from ███████████, robshumake@gmail.com (SUBJECT ACCOUNT 2),

sent over 20 emails to ███████████ regarding financial transactions and requests to

wire funds to other accounts between approximately July 2021 and December 2022.

38.    The flow chart set forth below summarizes the circumstances by which

Robert Shumake obtained at least part of the proceeds of the sale of 1 billion Minerco

shares:



39.    Based on my knowledge and experience, individuals will put shares in

the names of nominees and transfer shares through multiple entities to conceal the

true ownership interest of the shares and the financial transactions.

## **Minerco Issues False and Misleading Press Releases**

40.     As part of the "pump and dump" scheme, Shumake and Jenge caused positive Minerco press releases to be issued with the apparent intention of "pumping" or artificially inflating through false and misleading press releases the value of Minerco stock.  According to FINRA interview notes of a January 8, 2021 telephone interview with Shumake, Shumake reported that only he and Jenge, the CEO of Minerco, created Minerco press releases.  At least some Minerco press releases were false and misleading, assisted in "pumping" the value of Minerco shares, and were issued before the 1 billion Minerco shared were sold.  For example:

a.     On or about January 16, 2020, Minerco published a press release online that stated Minerco "has been acquired by a specialized investment firm" and also on or about January 24, 2020, that Minerco "was recently acquired by a psilocybin research and investment firm[.]"  Although the press releases do not name the investment firm, according to a recording of a December 2020 Minerco investor video conference, the purported Chief Operating Officer of Minerco announced that CBD Acquisitions had acquired a controlling interest in Minerco in December 2019.

b.     According to Georgia Secretary of State records, CBD Acquisitions, LLC, was formed as a corporation on October 31, 2019, by Jenge.  About a year later, in October 2020, according to open-source research, the Georgia Secretary of State dissolved/revoked CBD Acquisitions "for failure to file its annual registration

and/or failure to maintain a registered agent or registered office in this state." Based on the timing of CBD Acquisitions' formation and dissolution shortly thereafter, it does not appear that CBD Acquisitions was, in fact, "a specialized investment firm" or "a psilocybin research and investment firm," as stated in January 2020 press releases.

c.      On or about December 1, 2020, Minerco's Twitter Account (@MinercoInc) tweeted several photos purporting to show construction occurring on a Minerco mushroom farm. The tweet reads: "The construction of our first mushroom farm is continuing to advance amid the COVID-19 pandemic in the country."



d.      However, according to an interview of C.B., the owner of a company that leased land in Jamaica being used to develop a cannabis farm, photos tweeted by Minerco were of land his company leased in Jamaica and the land was never used for mushroom farming. C.B. reported that he recalls having conversations with an

individual from Michigan named Robert about getting involved with mushroom farming, that he had sent the individual pictures of his land in Jamaica, and that although he was sent a contract to sublease his land, he never entered into the contract. According to records from ███████, Shubox LLC transferred C.B.'s company $15,000 on or about March 1, 2023 and Shumake is a signatory on this account. C.B. reported to law enforcement after initially not recalling the payment, that it was made in connection with the purchase of several shipping containers.

      e.    On or about December 28, 2020, Minerco published a press release online that stated: "MINERCO . . . has hired ███████ to create business valuation," and that "Minerco anticipates the pre-money valuation and financial projections within 14 business days." The press release also included a quote attributed to Jenge, which stated: "It is significant to have a third party evaluate our business strategy to determine if we are on the right track for our shareholders."

      f.    According to an interview of the CEO of ███████ ███████ is a software valuation tool that can be purchased for about $300, the software allows a business to answer various questions about the business and input financial projections, and the software then calculates a valuation for the business instantly, based on the data inputted by the customer and various proprietary methodologies. The CEO of ███████ also reported that because ███████ is an online software tool, it cannot be "hired," as was stated in the Minerco press release, and that the quote

attributed to Jenge from the press release is false because ▮▮▮▮ does not "evaluate . . . business strategy[.]" Moreover, because ▮▮▮▮ instantly generates a valuation after a company inputs financial projections and other information, stating that "Minerco anticipates the pre-money valuation and financial projections within 14 business days" in a press release gives the false impression that it would take ▮▮▮▮ 14 days to generate a valuation, when in fact, it is done instantly.

g.    According to records from ▮▮▮▮ on or about December 28, 2020, the same day of the Minerco press release about ▮▮▮▮ an individual identifying himself as Robert Shumake created an account with ▮▮▮▮ and paid a fee of approximately $280 and received an invoice via email to robshumake@gmail.com (SUBJECT ACCOUNT 2).

h.    On or about January 19, 2021, Minerco published a press release online that stated: "Minerco Inc. the Magic Mushroom Company Receives 1B Valuation Pre-Money Business Valuation from ▮▮▮▮ . . . Minerco . . . has hired ▮▮▮▮ SOFTWARE to create business valuation using 3 methods . . . Minerco's Valuation report lists [International Private Equity Valuation] at 297M, [Discounted Cash Flow with Long Term Growth] AT 193M and [Discounted Cash Flow with Multiples] AT 1B. This Valuation was computed based upon financial projections from the business model." According to records from ▮▮▮▮ ▮▮▮▮ software generated a valuation report for Minerco on or about January 14,

2021 containing these reported valuations based on financial projections provided to ███████ The press release is nonetheless misleading because although the press release reported that Minerco had a $1 billion valuation, Minerco's publicly filed quarterly report from on or about January 31, 2021, stated that Minerco had $7.9 million in liabilities, and "[d]uring the six months ended January 31, 2021, the Company has an accumulated deficit of $38,526,604, net loss of $596,624 and no revenue."

41.    On or about January 2, 2020—before Shumake and Jenge began causing the issuance of false and misleading press releases—Minerco closed at $0.000001 according to trading data from Bloomberg.  On or about February 9, 2021, Minerco stock closed at $0.0158 up approximately 1.5 million percent from January 2, 2020 (and its highest price since January 2, 2020).  And the next day, the 1 billion shares controlled by Shumake began to be sold.

### Concealment of Shumake's Role at Minerco to the Public

42.    Even though Jenge and Shumake privately disclosed Shumake's involvement with Minerco, Shumake and Jenge concealed Shumake's role at Minerco to the public in an apparent effort to conceal that Shumake had been convicted of misdemeanor fraud crimes and that there were multiple negative news stories about Shumake.  For example, the following publicly available news stories were available online before Jenge and Shumake began work related to Minerco:

- On or about March 16, 2017, Fox 2 Detroit published an article online titled: "Robert Shumake – big shot busted" and states, among other things: "according to a police report, last June Robert Shumake was caught with several pounds of marijuana and $121,000 in cash outside a Shasta County motel."

- On or about March 1, 2018, Fox 2 Detroit published an article online titled: "Judge calls businessman Robert Shumake 'a criminal'" and states, among other things that Shumake "pleaded guilty to two misdemeanor violations of the credit services protection act[.]"

43.    According to a FINRA memo of a January 8, 2021 telephone interview with Shumake, "Shumake stated he is the head of business development and the corporate secretary" of Minerco.

44.    According to documents from OTC Markets, on or about January 8, 2021, juliusjenge@gmail.com (SUBJECT ACCOUNT 3) emailed OTC Markets, "I am out of the country. Please ad[d] robert Samuel to correspondence robert@minercoinc.com[.]  He is our corporate secretary."  According to driver's license records, Shumake's full name is Robert Samuel Shumake.

45.    Based on our investigation, Shumake also initiated or engaged in business negotiations with third parties on behalf of Minerco, but he had Jenge or other purported Minerco employees sign transaction documents on behalf of Minerco.

46.    Based on a review of publicly available quarterly reports filed by Minerco with OTC Markets signed in the name of Jenge, Minerco never publicly disclosed Shumake's involvement with the company.  In each quarterly report filed

between approximately April 2020 to May 2021, Minerco disclosed Jenge as the only officer, director, or control person even though a corporate secretary is generally a corporate officer position. If Minerco had disclosed Shumake's involvement, Minerco's public filings would have needed to disclose Shumake's prior criminal convictions because each quarterly report required Minerco to report whether any of its officers, directors, or control persons had a criminal conviction in the past 10 years.

47.   Several publicly filed Minerco quarterly reports from OTC Markets listed "Jameson Holdings LLC (███████)" with 1 billion Minerco shares as being the "Individual/Entity Shares were issued to (entities must have individual with voting / investment control disclosed)" without disclosing that Robert Shumake, in truth, controlled these shares.

48.   Shumake also misrepresented and concealed his knowledge and involvement in the trading of Minerco stock to FINRA. According to a FINRA memo of a January 8, 2021 telephone interview with Shumake: "When asked if he owns any MINE stock, Shumake said no. When asked if he has ever traded in MINE stock, Shumake said never. When asked if he was aware of any specific individuals or entities trading in MINE stock, Shumake said no." These statements were false. For example, by January 8, 2021, Shumake knew that ███ had purchased Minerco stock and just a few weeks before his FINRA interview, on or about December 16,

2020, Shumake texted ███ "You might want to check your MINE stock today"
according to WhatsApp messages from ███

### The Securities and Exchange Commission Suspends Trading in Minerco

49.    On or about May 26, 2021, according to a Securities and Exchange Commission Order of Suspension of Trading, trading in Minerco was suspended between May 27, 2021 and June 10, 2021.  The Order stated: "the public interest and the protection of investors require a suspension in the trading of the securities of Minerco, Inc . . . because of questions and concerns regarding the adequacy and accuracy of information about the Company in the marketplace and unusual and unexplained activity affecting the market for its securities. These include questions and concerns about the status of its corporate organization, its ownership, ***the accuracy and completeness of its public statements to investors*** about its activities, inconsistencies between its statements on social media and in its press releases as compared to its financial disclosures on www.OTCMarkets.com, and the possibility of manipulation of the market for its securities."  (emphasis added).

50.    According to OTC Markets, Minerco has not made any disclosures, such as quarterly or annual reports since on or about May 25, 2021.  Moreover, although Minerco issued at least 25 press releases online beginning in January 2021 as part of the "pump and dump scheme," based on my review of online press releases, Minerco has not issued any press releases since approximately June 2021.

As set forth above, by March 2021, approximately 930 million Minerco shares controlled by Shumake had been sold and Shumake obtained at least $2.5 million from the sale of these shares. This activity is consistent with my understanding of a "pump and dump" scheme. Further, as set forth below and according to Bloomberg trading data, after the SEC's trading suspension Minerco stock fell in value to approximately zero dollars.



**Economic Injury Disaster Loan Fraud (EIDL)**

51.     The EIDL program provides low-interest loans to businesses suffering the effects of a disaster. In March 2020, Congress deemed the COVID-19 pandemic a disaster under the EIDL program. To obtain an EIDL, a qualifying business was required to submit an application to the Small Business Administration ("SBA") and

provide information about its operations, such as the number of employees, gross revenues for the 12-month period preceding the disaster, and cost of goods sold in the 12-month period preceding the disaster.  In the case of EIDLs for COVID-19 relief, the 12-month period was the year preceding January 31, 2020.  The applicant was required to certify that all the information in the application was true and correct and agree in the required Loan Authorization and Agreement that the EIDL funds would be used solely as working capital to alleviate economic injury caused by disaster.  The amount of an EIDL, if the application was approved, was determined based, in part, on the information provided in the application about employment, revenue, and cost of goods, as set forth above.  Any funds issued under an EIDL are issued directly by the SBA.

52.    On or about July 30, 2020, according to WhatsApp messages from █████ Shumake messaged █████ "Applying for loan for you."  Then, on or about July 31, 2020, according to records from SBA, an EIDL application for Jameson Holdings LLC was submitted in the name of █████  The application stated that "Gross Revenues for the Twelve (12) Months Prior to the Date of the Disaster (January 31, 2020)" were $150,000.00, that the "Number of Employees (as of January 31, 2020) was 2; that the "date business established" was January 20, 2019, and that █████ owned 85% of the company.  The application listed the email address: █████@yahoo.com (SUBJECT ACCOUNT 1).

53.     The same day, according to WhatsApp messages from ▮ Shumake texted ▮ a photo of a laptop screen that showed an SBA website that stated an EIDL application was submitted with application number 3312380484.  According to SBA records, this is the application number for the Jameson Holdings EIDL application.  ▮ immediately responded: "Who's that for?" Shumake replied: "U. I did it.  U playing." ▮ replied: "U think they will approve me[?]" and Shumake replied: "One way to find out.  I worked my magic[.]"

54.     Based on our investigation, there is probable cause to believe that Shumake's EIDL application for Jameson Holdings contained false information.  Although Shumake stated in the application that Jameson Holdings was established on January 20, 2019, in truth, Virginia State Corporation Commission records reflect that Jameson Holdings was formed approximately 14 months later—on March 23, 2020.  And according to the CARES Act, to be eligible for an EIDL loan, a business must have been in operation by January 31, 2020.  *See* 15 U.S.C.A. § 9009(c)(2).  In addition, the statement that Jameson Holdings had $150,000 in "Gross Revenues for the Twelve (12) Months Prior to the Date of the Disaster (January 31, 2020)" is false because Jameson Holdings had not been formed until after January 31, 2020.

55.     According to records from SBA, on or about August 1, 2020, an EIDL application for Shumoja Industries LLC was submitted in the name of ▮ listing SUBJECT ACCOUNT 2 (robshumake@gmail.com) on the application.  The

application stated that "Gross Revenues for the Twelve (12) Months Prior to the Date of the Disaster (January 31, 2020)" were $300,000.00, that the "Number of Employees (as of January 31, 2020) was 3; that the "date business established" was January 2, 2015, and that ███ owned 81% of the company. Moreover, according to WhatsApp messages from ███ Shumake texted ███ on or about August 1, 2020: "Got another approval" and he texted her a screenshot from SBA's website showing an application being processed for a $145,000 loan for Shumoja Industries LLC.

56.    Based on our investigation, there is probable cause to believe that Shumake's EIDL application for Shumoja Industries contained false information. In particular, although Shumake stated in the application that Shumoja Industries had "Gross Revenues for the Twelve (12) Months Prior to the Date of the Disaster (January 31, 2020)" of $300,000.00 and that the "Number of Employees (as of January 31, 2020) was 3, records received from the Internal Revenue Service ("IRS") in June 2023, reflect that IRS has no record of Shumoja Industries LLC filing any federal tax returns from 2019 to 2021. IRS guidance states that: "Generally, employers must report wages, tips and other compensation paid to an employee by filing the required form(s) to the IRS."[2] In addition, according to records from the Michigan Department of Treasury, it has no record of business tax

---

[2] https://www.irs.gov/businesses/small-businesses-self-employed/depositing-and-reporting-employment-taxes

records for tax years 2018 through 2022 for Shumoja Industries LLC.

57.    On or about August 8, 2020, according to records from SBA, an EIDL Loan Authorization and Agreement for a $145,000 EIDL loan for Shumoja Industries LLC was electronically signed in the name of ███ and the associated email address is identified as robshumake@gmail.com (SUBJECT ACCOUNT 2) on a DocuSign certification of completion.  Further, on or about August 11, 2020, SBA attempted to transfer $145,000 to the account listed on the loan application, but the funds were returned due to "invalid account number."

58.    On or about August 11, 2020, according to WhatsApp messages from ███ ███ texted Shumake: "Please don't take the loans on my name."  ███ also texted Shumake: "And you applying for loans on my name is also fraud!" to which Shumake responded: "actually it's not.  Dummy."

59.    On or about August 12, 2020, according to WhatsApp messages from ███ Shumake texted ███ a PDF copy of an August 8, 2020 EIDL Loan Authorization and Agreement for a $145,000 EIDL loan for Shumoja Industries LLC signed in the name of ███ ███ then responded: "But I didn't sign it. It's 145k loan."

60.    According to records from SBA regarding the Jameson Holdings EIDL application, on or about August 14, 2020, ███ called SBA and "stated she wanted to cancel the loan application" and on or about August 17, 2020 SBA notified ███ that SBA would not offer an EIDL loan to Jameson Holdings.

61.    On or about August 17, 2020, according to WhatsApp messages from ███ ██ texted Shumake: "Got email one loan canceled. Please cancel the other one because I don't have the email" and Shumake replied: "I think you should have a talk with the youngins and come up with a plan. Don't look a gift horse in the mouth."

62.    According to records from SBA, on or about September 8, 2020, █████████@yahoo.com (SUBJECT ACCOUNT 1), emailed SBA with subject line: "3312380484," which is the EIDL application number for the Jameson Holdings loan application.  The email reads: "On August 18th I received a denial letter for my lack of response . . . I am seeking a reconsideration."

63.    According to records from SBA regarding the Jameson Holdings EIDL application, on or about October 5, 2020, SBA left a voicemail with ███  The same day, according to WhatsApp messages from ███ ██ texted Shumake: "The SBA people called and left me a voicemail message to call them."  Shumake responded: "They are going to ask you what your company does. Tell them that you sell garments things you know about. You ship globally. You don't have a website Because most of the people get to you Thru referral. You grossed 150k last year . . . They may ask about Shumoja industries. Doubt it. It means unity and does business in Africa too. It did 300k last year . . . Jameson holdings you also did some stock trading. If you don't remember something say it."  SBA records reflect that on or

about October 5, 2020, ██ was informed that SBA would not offer Jameson Holdings an EIDL loan due to "unverifiable information" and that SBA never funded the Jameson Holdings EIDL loan.

64.    According to records from SBA regarding the Shumoja Industries EIDL application, on or about November 7, 2020, SBA called the borrower and sent a follow up email.  The same day, according to WhatsApp messages from ██ Shumake texted ██ "Sba emailed me.  Finally they have a few qs. They want to discuss loan."  Later that day, Shumake texted ██ "U have to call." ██ later replied: "I don't mind calling but it's your loan and you know how long you've had the company and all the questions they may ask."  Shumake later texted: "Gross revenue 300k . . . U help people in USA do bus in Africa." ██ then texts Shumake: "I did call them . . . She sent you email."  Ultimately, SBA did not disburse the Shumoja Industries EIDL loan.

## PROBABLE CAUSE THAT EVIDENCE OF OFFENSES IS CONTAINED IN THE SUBJECT ACCOUNTS

### *SUBJECT ACCOUNT 1 (*██*@yahoo.com)*

65.    There is probable cause that a search of SUBJECT ACCOUNT 1, will identify evidence, fruits, and instrumentalities of both the "pump and dump" fraud scheme and the EIDL fraud scheme.

66.    According to records from the Transfer Agent, SUBJECT ACCOUNT 1 sent, received, or was copied on over 20 emails relating to Minerco between in or

around February 2020 and December 2020.  For example, on or about March 3, 2020, SUBJECT ACCOUNT 1 emailed Minerco's Transfer Agent: "Please transfer 1b shares of a minero Inc stock owned by Jameson holdings llc a company i am sole owner to myself directly ███████," and on or about November 13, 2020, SUBJECT ACCOUNT 1 emailed Minerco's Transfer Agent a request to transfer 1 billion Minerco shares to ███████.  Further, the Jameson Holdings EIDL application listed SUBJECT ACCOUNT 1 on the application, on or about September 8, 2020, SUBJECT ACCOUNT 1 emailed the Small Business Administration about the Jameson Holdings loan application: "I am seeking a reconsideration," and on or about October 3, 2020, SUBJECT ACCOUNT 1 received an email from SBA stating: "We have reviewed your request for reconsideration of your disaster loan application.  Based on our review, we have determined that your file should be reactivated for further consideration."

## *SUBJECT ACCOUNT 2 (robshumake@gmail.com)*

67.     There is probable cause that a search of SUBJECT ACCOUNT 2, will identify evidence, fruits, and instrumentalities of both the "pump and dump" fraud scheme and the EIDL fraud scheme.

68.     According to records from the Transfer Agent, SUBJECT ACCOUNT 2 sent, received, or was copied on over 40 emails relating to Minerco between in or around November 2019 and April 2021.  For example, on or about November 21,

2019, SUBJECT ACCOUNT 2, emailed Jenge and the Transfer Agent: "can you send a shareholder list for otc [markets] application," on or about October 15, 2020, SUBJECT ACCOUNT 2 emailed the Transfer Agent copying Jenge: "Can you check on book entry shares from Jameson holdings," and on or about December 20, 2020, SUBJECT ACCOUNT 2 emailed the Transfer Agent: "Did they █████ request stock transferred into their ███████ account yet?" Further, on or about August 1, 2020, according to records from SBA, an EIDL application for Shumoja Industries LLC was submitted listing SUBJECT ACCOUNT 2 (robshumake@gmail.com) on the application, the Shumoja Industries EIDL loan agreement DocuSign certificate of completion dated August 8, 2020 identifies SUBJECT ACCOUNT 2 as the associated email address, on or about September 17, 2020, SUBJECT ACCOUNT 2, emailed SBA regarding the Shumoja Industries EIDL loan: "Please correct my bank information," and on or about the same day, SBA emailed SUBJECT ACCOUNT 2: "Thank you for contacting the U.S. Small Business Administration Customer Service Center regarding assistance related to the Coronavirus (COVID-19) Pandemic."

## *SUBJECT ACCOUNT 3 (juliusjenge@gmail.com)*

69.    There is probable cause that a search of SUBJECT ACCOUNT 3, will identify evidence, fruits, and instrumentalities of the "pump and dump" fraud scheme.

70.    According to records from the Transfer Agent, SUBJECT ACCOUNT 3 sent, received, or was copied on over 45 emails relating to Minerco between in or around November 2019 and March 2021 and according to records from OTC Markets, SUBJECT ACCOUNT 3 sent, received, or was copied on over 50 emails related to Minerco between in or around November 2019 and June 2021.  For example, on or about November 21, 2019, SUBJECT ACCOUNT 3 emailed OTC Markets a Stock Purchase Agreement between Minerco and CBD Securities Acquisition, on or about December 9, 2019, SUBJECT ACCOUNT 3 emailed Minerco's Transfer Agent: "I Julius Makiri Jenge, confirm[] that I'm the CEO for Minerco, Inc," on or about December 16, 2020, SUBJECT ACCOUNT 3 emailed Minerco's Transfer Agent a document signed in the name of Jenge related to the transfer of 1 Billion Minerco shares to ███████████████ and on or about January 8, 2021, SUBJECT ACCOUNT 3 emailed OTC Markets, "I am out of the country. Please ad[d] robert Samuel to correspondence[.]"

### *SUBJECT ACCOUNT 4 (robert@minercoinc.com)*

71.    There is probable cause that a search of SUBJECT ACCOUNT 4, will identify evidence, fruits, and instrumentalities of the "pump and dump" fraud scheme.

72.    For example, on or about January 8, 2021, Jenge emailed OTC Markets, "I am out of the country.  Please ad[d] robert Samuel to correspondence

robert@minercoinc.com[.] He is our corporate secretary[,]" on or about January 12, 2021, SUBJECT ACCOUNT 4 received an email from the CEO of another company about a joint venture agreement with Minerco and SUBJECT ACCOUNT 4 responded: "Received. I will review," on or about January 16, 2021, SUBJECT ACCOUNT 4 emailed the same CEO that Minerco's Chief Operating Officer should sign a non-disclosure agreement related to the potential joint venture agreement, on or about January 25, 2021, SUBJECT ACCOUNT 4 emailed the CEO of the same company about "content we could have." Further, in response to a request from FINRA about Minerco, on or about January 9, 2021, SUBJECT ACCOUNT 4 emailed FINRA a set of documents relating to Minerco, and on or about January 11, 2021, SUBJECT ACCOUNT 4 emailed FINRA the name of a company Shumake said Minerco used to purchase equipment.

### *SUBJECT ACCOUNT 5 (robshumake@icloud.com)*

73.     There is probable cause that a search of SUBJECT ACCOUNT 5, will identify evidence, fruits, and instrumentalities of the "pump and dump" fraud scheme. For example, on or about October 7, 2020 SUBJECT ACCOUNT 5 emailed the Minerco Transfer Agent a credit card authorization form for $2,000, on or about October 28, 2020, SUBJECT ACCOUNT 5 emailed the Minerco Transfer Agent: "we were expecting a stock loan to the company. Apparently there was a mix up in the stock power certificate and the note holder is fixing that," on or about

November 26, 2019, SUBJECT ACCOUNT 5 emailed the Minerco Transfer Agent: "Following up on if we have received word on DWAC," which refers to having the ability to make electronic deposits and withdrawals of securities, and on or about April 25, 2020, SUBJECT ACCOUNT 5 emailed a representative of ███ a Minerco financial balance sheet.

### *SUBJECT ACCOUNT 6 (@MinercoInc)*

74.    There is probable cause that a search of SUBJECT ACCOUNT 6, will identify evidence, fruits, and instrumentalities of the "pump and dump" fraud scheme.  Between November 2019 and June 2021, the Twitter Account (now X Corp.) @MinercoInc (SUBJECT ACCOUNT 6) tweeted numerous times regarding Minerco, including by tweeting false and misleading press releases as part of the pump and dump scheme.  For example, on or about January 16, 2020, SUBJECT ACCOUNT 6 tweeted an article titled: "Investment Firm Acquires Minerco, Announces Launch of Psilicybin, 'Magic Mushroom' Business Model," on or about December 1, 2020, SUBJECT ACCOUNT 6 tweeted a press release titled: "The construction of our first mushroom farm is continuing to advance amid the COVID-19 pandemic in the country" along with several photos purporting to show construction work, on or about December 17, 2020, SUBJECT ACCOUNT 6 tweeted: "The Magic Mushroom company little company with BIG Dreams. Sending good vibes to all MINERS and friends," on or about January 15, 2021,

SUBJECT ACCOUNT 6 tweeted: "The Magic Mushroom company little company with BIG Dreams. Finally received our Valuation Report from ███████ Software. 14 Days later," on or about January 18, 2021, SUBJECT ACCOUNT 6 tweeted: "Minerco Inc. the Magic Mushroom Company Receives 1B Valuation Pre-Money Business Valuation from ████████ on or about February 19, 2021, SUBJECT ACCOUNT 6 tweeted a press release titled: "The Magic Mushroom Company join us Minerco Inc., The Magic Mushroom Company, Addresses Speculative Rumors and Information Circulating Social Media Platforms," on or about April 14, 2021, SUBJECT ACCOUNT 6 tweeted: "The Magic Mushroom Company.  We are working on something amazing. Stay tuned," on or about May 14, 2021, SUBJECT ACCOUNT 6 tweeted: "One Love our new location in Jamaica. Thanks for believing in us. MinersUnited. Can't stop won't stop!!!!"

## BACKGROUND CONCERNING E-MAIL

75.     In my training and experience, I have learned that the SUBJECT EMAIL PROVIDERS provide a variety of on-line services, including email access, to the public.  The SUBJECT EMAIL PROVIDERS allow subscribers to obtain email accounts at various domain names (e.g., yahoo.com, gmail.com, minercoinc.com, icloud.com), like the accounts listed in Attachment A-1, A-2, A-3, and A-4.  Subscribers obtain an account by registering with the SUBJECT EMAIL PROVIDERS.  During the registration process, the SUBJECT EMAIL

PROVIDERS ask subscribers to provide basic personal information. Therefore, the computers of the SUBJECT EMAIL PROVIDERS are likely to contain stored electronic communications (including retrieved and un-retrieved emails) and information concerning subscribers and their use of the SUBJECT EMAIL PROVIDERS' services, such as account access information, email transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

76.     In my training and experience, the SUBJECT EMAIL PROVIDERS generally ask their subscribers to provide certain personal identifying information when registering for an email account. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. Based on my training and my experience, I know that, even if subscribers insert false information to conceal their identity, this information often provides clues to their identity, location, or illicit activities.

77.     In my training and experience, the SUBJECT EMAIL PROVIDERS

typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (*i.e.*, session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, the SUBJECT EMAIL PROVIDERS often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account.

78. In my training and experience, in some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Email providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to

identify the account's user or users.

79.    As explained herein, information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored in connection with an email account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, email communications, contact lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further, information maintained by the email provider can show how and when the account was accessed or used. For example, as described below, email providers typically log the Internet Protocol (IP) addresses from which users access the email account, along with the time and date of that access. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the email account access and use relating to the crime under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner. Additionally, information stored at the user's account may further indicate the

geographic location of the account user at a particular time (*e.g.*, location information integrated into an image or video sent via email). Last, stored electronic data may provide relevant insight into the email account owner's state of mind as it relates to the offense under investigation. For example, information in the email account may indicate the owner's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement).

## BACKGROUND CONCERNING TWITTER[3]

80.    X Corp. owns and operates Twitter, a social networking and microblogging service that can be accessed at http://www.twitter.com and via the Twitter mobile application ("app"). Generally, Twitter allows users to register and create an account; to personalize (if desired) an account profile page; and to send

---

[3] The information in this section is based on information published by Twitter on its website, including, but not limited to, the following document and webpages: "Guidelines for law enforcement," available at https://help.twitter.com/en/rules-and-policies/twitter-law-enforcement-support, "Using Twitter," available at https://help.twitter.com/en/using-twitter, and "New user FAQ," available at https://help.twitter.com/en/new-user-faq.

and receive communications via the platform. These functionalities are discussed in more detail below.

81.    Twitter permits its users to communicate via messages that can contain photos, videos, links, and/or text. Users can choose to share these messages, called "Tweets," with the public or, alternatively, to "protect" their Tweets by making them viewable by only a preapproved list of "followers." Each Tweet includes a timestamp that displays when the Tweet was posted to Twitter. Users can also Tweet a copy of other Tweets ("retweet") or Tweet a reply to another Tweet. Users can also indicate that they like a Tweet by clicking on a heart icon that appears next to each Tweet on the platform.

82.    Twitter also permits its users to exchange private messages, known as "direct messages" or "DMs," with other Twitter users. DMs, which also may include photos, videos, links, and/or text, can only be viewed by the sender and designated recipient(s). Direct messages may be sent to an individual user or to a group of Twitter users. Twitter users have the ability to choose whether they can receive a direct message from anyone. At any time, a Twitter user has the ability to alter the settings on their Twitter account so that they can receive direct messages only from (1) individuals to whom the user has already sent a direct message and (2) Twitter accounts that the user "follows" via his account.

83.     While individuals are not required to register with Twitter to view the content of unprotected Tweets, individuals must register for a Twitter account to send Tweets, to "follow" accounts in order to view protected Tweets, and to send and receive direct messages. A user may register for an account for free by visiting Twitter's website or via the Twitter app. When a user creates a new Twitter account, Twitter assigns that account a unique user ID ("UID"). A user must also select a password as well as a unique Twitter username (also known as a "handle"). Twitter then appends the @ symbol in front of whatever username the user selects to create the Twitter username (for example: @example). The user may also select a different name (the "display name"), which is not automatically preceded by the @ symbol, to be displayed on his profile picture and at the top of his Tweets alongside his Twitter username.  The display name can include symbols similar to emojis. The user can change their password, username, and/or display name at any time, but the UID for the account will remain constant.

84.     At the time of account creation, Twitter asks the user for certain identity and contact information, including: (1) name; (2) email address and/or telephone number; and (3) month and year of birth. Twitter also keeps certain information relating to the creation of each Twitter account, including: (1) the date and time at which the user's account was created; and (2) the method of account creation (e.g., website or Twitter app).

85.    Upon the creation of a Twitter account, a generic profile page is automatically created for the user. This page displays information including (1) the user's Twitter username; (2) the display name; (3) the number of Twitter accounts the user is following; (4) the number of Twitter accounts that are following the user; and (5) Tweets sent by the user (although, as noted above, if the user has chosen to protect their Tweets they will be visible only to preapproved "followers"). The user can personalize this page by posting a personal picture or image (known as an "avatar") to appear on the page and/or a banner image to appear across the top of the profile page. The user can also add text to create a short biography, to identify his location, to provide a link to his website, or to specify his date of birth.

86.    As noted above, Twitter users can use their account to send and receive communications. If a Tweet includes a Twitter username that is preceded by the @ symbol, that is referred to as a "mention." The Twitter user mentioned in the Tweet will receive a notification informing them that they have been mentioned and showing the content of that Tweet. Similarly, if another Twitter user replies to a Tweet sent by a user, the user who sent the original Tweet will receive a notification that someone replied to their message, and the notification will show the content of that reply.

87.    Twitter users can also include links to webpages in their Tweets and Direct Messages. Twitter automatically processes and shortens links provided by the

user to a shortened link that starts http://t.co/. Twitter tracks how many times these shortened links are clicked.

88.     A registered Twitter user can also "like" a Tweet by clicking a heart icon on a Tweet sent by another user. If another user "likes" a Tweet that is posted by the Twitter user, a notification will appear in the user's account identifying what Tweet was liked and who liked it.

89.     As noted above, users can include photographs, images, and videos in their Tweets. Each account has a "media timeline" on their profile that displays "the photos, videos, and GIF's [the accountholder] has uploaded with [their] Tweets." An individual can view a Twitter user's media timeline by visiting the user's Twitter profile page.

90.     Twitter users can also opt to Tweet with their location attached. This functionality is turned off by default, so Twitter users must opt-in to utilize it. However, if a Twitter user enables Twitter to access their precise location information, the Twitter user will have the option of attaching their location (e.g., the name of a city or neighborhood) to a Tweet at the time it is sent. If the user uses Twitter's in-app camera to attach a photo or video to the Tweet while the functionality is enabled, the Tweet will include both the location label (e.g., the name of a city or neighborhood) of the user's choice as well as the device's precise location in the form of latitude-longitude coordinates. The user can turn this functionality off

(thereby removing their location from their Tweets) at any time, and they can delete their past location data from Tweets that have already been sent.

91.    A Twitter user may choose to "follow" another Twitter user. If a Twitter account is unprotected (i.e., privacy settings have not been enabled), the user can follow another user simply by clicking the "follow" button on the other user's Twitter profile page. If a Twitter account is protected (i.e., privacy settings have been enabled), the user can follow another user by clicking the "follow" button and waiting for the other user to approve their request. Once an account is followed by a Twitter user, the Tweets posted by the account the user follows will appear in the user's Twitter Home timeline. Every time a Twitter user follows another account, Twitter sends a notification to the account being followed to inform them about the new follower. Each user's Twitter profile page includes a list of the people who are following that user and a list of people whom that user follows. Twitter users can "unfollow" other users whom they previously followed at any time. Twitter also provides users with a list of "Who to Follow," which includes a few recommendations of Twitter accounts that the user may find interesting based on the types of accounts that the user is already following and who those people follow.

92.    A Twitter user can also "block" other Twitter users. This prevents the blocked account from contacting or following the user or from seeing the user's

Tweets. Twitter does not notify the user of a blocked account when another Twitter account blocks them.

93.    A Twitter user can also use Twitter's integrated search function. When a user types a search term into Twitter's search tool, it will return results that include accounts, Tweets, and photos that match that search term. Twitter users using the service via the Twitter mobile app also have the option of saving searches that they have performed. A user can delete such saved searches at any time.

94.    A Twitter user can also join or create "Lists" of other Twitter accounts. These Lists often organize Twitter accounts by group, topic, or interest. Viewing a timeline of a specific List will show you a stream of Tweets made only by accounts that are on that List. Users can pin their favorite lists to their Twitter Home timeline page. Twitter users have the ability to remove their accounts from Lists upon which it may appear.

95.    Twitter also offers a functionality called "Spaces," which it calls "a new way to have audio conversations on Twitter." Any user can create a Space; that user is referred to as the "host." Spaces are public, so anyone can join and listen to the conversation within a Space once it is created, although a user can send another Twitter user a link to their Space and invite them to join. By default, the only individuals permitted to speak in a Space are the individuals that the host invites to

do so, although this setting can be modified to allow a broader set of individuals to speak.

96.     Twitter also offers the ability to sign into third-party apps and websites using one's Twitter account. Typically, the third-party app or website will have a link that enables the user to sign into the third-party service using their Twitter account. Doing so grants the third-party service access to the Twitter user's account. Depending on the authorizations the Twitter user gives to the third-party service, the third-party service may be able to read the user's Tweets, see who the user follows on Twitter, post Tweets to the user's profile, or access the user's email address. A user can revoke a third-party app or website's authorization to access their Twitter account and associated data at any time.

97.     Twitter collects and retains information about a user's use of the Twitter service, to include: (1) content of and metadata relating to Tweets and Direct Messages; (2) photos, images, and videos that are shared via Twitter and stored in the user's Media Timeline; (3) the identity of the accounts that a user follows and the accounts that follow the user's account; (4) the content uploaded to a user's profile page, including their avatar, banner image, and bio; (5) information about Tweets the account has liked; (6) information about Lists associated with the account; (7) information about the Spaces that a user has participated in, including the host of the Space, its start and end times, and information about other attendees;

and (8) applications that are connected to the Twitter account. Twitter also collects and retains various other data about a user and his/her activity, including:

    a. logs of Internet Protocol ("IP") addresses used to login to Twitter and the timestamp associated with such logins;

    b. transactional records reflecting, for example, when a user changed their display name or email address;

    c. the identities of accounts that are blocked or muted by the user; and

    d. information relating to mobile devices and/or web browsers used to access the account, including a Twitter-generated identifier called a UUID that is unique to a given device.

98.    In some cases, Twitter users may communicate directly with Twitter about issues relating to their account, such as technical problems or complaints. Social networking providers like Twitter typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications. Twitter may also suspend a particular user for breaching Twitter's terms of service, during which time the Twitter user will be prevented from using Twitter's services.

99.    Additionally, providers of electronic communications services and remote computing services often collect and retain user-agent information from their

users. A user agent string identifies, among other things, the browser being used, its version number, and details about the computer system used, such as operating system and version. Using this information, the web server can provide content that is tailored to the computer user's browser and operating system.

100.    In my training and experience, evidence of who was using a Twitter account and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion. For example, the evidence may establish who and how co-conspirators communicated in private to facilitate their scheme.

101.    Based on my training and experience, direct messages, photos, videos, and documents are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation. Thus, stored communications and files connected to a Twitter account may provide direct evidence of the offenses under investigation and can also lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

102.    In addition, the user's account activity, logs, stored electronic communications, and other data retained by Twitter can indicate who has used or

controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geolocation, date and time) may be evidence of who used or controlled the account at a relevant time. Similarly, device identifiers and IP addresses can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

103.    Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (*e.g.*, information indicating a plan to commit a crime), or consciousness of guilt (*e.g.*, deleting account information in an effort to conceal evidence from law enforcement).

104.    Other information connected to the use of an account may lead to the discovery of additional evidence. For example, accounts are often assigned or associated with additional identifiers such as account numbers, advertising IDs, cookies, and third-party platform subscriber identities. This information may help

establish attribution, identify and link criminal activity across platforms, and reveal additional sources of evidence.

105.    Therefore, Twitter's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Twitter. In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

## REQUEST TO SUBMIT WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

106.    I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of Criminal Procedure, permission to communicate information to the Court by telephone in connection with this Application for a Search Warrant. I submit that Trial Attorney, Kyle Crawford, an attorney for the United States, is capable of identifying my voice and telephone number for the Court.

## CONCLUSION

107.    Based on the foregoing, I request that the Court issue the proposed search warrants.  Because the warrants will be served on Yahoo Inc., Google LLC, Microsoft Corporation USA, Apple Inc., and X Corp., which will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrants at any time day or night.  Pursuant to 18 U.S.C.

§ 2703(g), the presence of a law enforcement officer is not required for the service

or execution of the warrants.

Respectfully submitted,

Senior Special Agent George Adams
Securities and Exchange Commission,
Office of Inspector General

Sworn to me and signed in my presence
And/or by electronic means.

Curtis Ivy, Jr.,
UNITED STATES MAGISTRATE JUDGE

52

## ATTACHMENT A-2

### Property to Be Searched

This warrant applies to information associated with the following accounts that are stored at premises owned, maintained, controlled or operated by Google LLC, a company headquartered at 1600 Amphitheatre Parkway, Mountain View, CA:

- robshumake@gmail.com

- juliusjenge@gmail.com

## ATTACHMENT B-1

### Particular Things to be Seized and
### Procedures to Facilitate Execution of the Warrant

**I.    Information to be Disclosed by Yahoo Inc., Google LLC, Microsoft Corporation USA, and Apple Inc. to Facilitate Execution of the Warrant**

To the extent that the information described in Attachment A-1, A-2, A-3, or A-4 is within the possession, custody, or control of Yahoo Inc., Google LLC, Microsoft Corporation USA, or Apple Inc. (the "Providers") regardless of whether such information is located within or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available, or has been preserved pursuant to any previous requests made under 18 U.S.C. § 2703(f), the Provider is required to disclose the following information to the Government for each account or identifier listed in Attachment A-1, A-2, A-3, or A-4:

1.    The contents of all emails associated with the account dating **from October 1, 2019, to December 31, 2021**, including stored or preserved copies of emails sent to and from the account, draft emails, the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email.  The contents of all communications and related transactional records for all services used by the subscriber(s)/user(s) of the email account such as: (i) e-mail services, calendar services, file sharing or storage

services, photo sharing or storage services, instant messaging or chat services, voice call services, or remote computing services, including but not limited to incoming, outgoing, and draft e-mails, messages, calls, chats, and other electronic communications; (ii) attachments to communications (including native files); (iii) source and destination addresses and header or routing information for each communication (including originating Internet Protocol ("IP") addresses of e-mails); (iv) the date, size, and length of each communication; and (v) any user or device identifiers linked to each communication (including cookies);

2.      All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers, alternative e-mail addresses provided during registration, means and source of payments (including any credit cards or bank account numbers) and other identifiers, records of session times and durations (including IP addresses, cookies, device information, and other identifiers linked to those sessions), records of account registration (including the IP address, cookies, device information, and other identifiers linked to account registration), the date on which the account was created, the length of service and the types of services utilized, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, methods of connecting, and server log files, the IP address used to register the account, log-in IP addresses associated with session times and dates, server log files;

3.     The types of service utilized;

4.      Basic subscriber records and login history (including, as described in 18 U.S.C. § 2703(c)(2), names, addresses, records of session times and durations, length of service and types of service utilized, instrument numbers or other subscriber numbers or identities, and payment information) concerning any email account (including both current and historical account) ever linked to the email account by common e-mail addresses (such as a common recovery e-mail address), or a common telephone number, means of payment (*e.g.*, credit card number), registration or login IP addresses (during one-week period), registration or login cookies or similar technologies, or any other unique device or user identifier;

5.     All records and other information concerning any document, or other computer file created, stored, revised, or accessed in connection with the email account or by the subscriber(s)/user(s) of the email account, including: (i) the contents and revision history of each document or other computer file, and all records and other information about each connection made to or from such document or other computer file, including the date, time, length, and method of connection from **October 1, 2019, to December 31, 2021**; (ii) server log records; (iii) data transfer volume; and (iv) source and destination IP addresses and port numbers;

6.     All device or user identifiers which have ever been linked to the email account, including but not limited to all cookies and similar technologies, unique

application numbers, hardware models, operating system versions, device serial numbers, Global Unique Identifiers ("GUID"), mobile network information, telephone numbers, Media Access Control ("MAC") addresses, and International Mobile Equipment Identities ("IMEI");

7.     All records or other information stored by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, files, and search histories;

8.     All records pertaining to communications between Provider and any person regarding the account, including contacts with support services and records of actions taken; and

9.     For all information required to be disclosed pursuant to this warrant, the physical location or locations where the information is stored.

## II.    Information to be Seized by the Government

All information described above in Section B-1 that constitutes fruits, contraband, evidence and instrumentalities of violations of 18 U.S.C. § 1343 (Wire Fraud), § 1956 (Money Laundering), 15 U.S. Code § 78j(b), 17 C.F.R. § 240.10b-5 (Securities Fraud), and conspiracy to commit those offenses, including, for each account or identifier listed on Attachment A-1, A-2, A-3, or A-4 the following information:

    a.  Communications and documents relating to Minerco, Inc.;

b.  Communications and documents relating to 'magic mushrooms;'

c.  Communications and documents relating to Jameson Holdings, ██████, CBD Acquisitions, and ████████;

d.  Communications and documents relating to OTC Markets;

e.  Communications and documents related to banking and financial records;

f.  Records relating to the receipt, transfer, or other disposition of any criminal proceeds;

g.  Evidence indicating how and when the email account was accessed or used in furtherance of the crimes under investigation, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the email account owners;

h.  The identity of persons who created or used the email account, including records that help reveal the whereabouts of such persons;

i.  User attribution information that tends to show the person or persons who utilized and/or communicated using the email account;

j.  Any deleted emails, documents, information, or communications that were created or deleted in furtherance of the crimes under investigation, or any other communications that Provider may retain and any records or information associated with efforts to delete those emails or communications—including the dates on, and IP addresses from which any efforts to delete were made;

k.  The identity of persons who communicated with the email account about matters relating to the crimes under investigation, including records that help reveal their whereabouts;

l.  Information that constitutes evidence concerning persons who collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; and

m. Information that constitutes evidence indicating the email account user's state of mind, *e.g.*, intent, absence of mistake, or evidence

indicating preparation or planning, related to the criminal activity under investigation.

In addition to the materials listed above, for the accounts identified in Attachment A-1 as ███████yahoo.com and Attachment A-2 as robshumake@gmail.com

    a. Communications and documents related to the Economic Injury Disaster Loan Program and the Small Business Administration.

## III.    Government Procedures for Warrant Execution

The Government will conduct a search of the information produced and determine which information is within the scope of the information to be seized specified in Section II. That information that is within the scope of Section II may be copied and retained by the United States.

The search procedure may include the following techniques (the following is a non-exclusive list, and the Government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein):

    a. searching for and attempting to recover any hidden or encrypted data to determine whether that data falls within the list of items to be seized as set forth herein;

    b. surveying various file directories and the electronic mail, including attachments thereto, to determine whether they include data falling within the list of items to be seized as set forth herein;

    c. opening or reading portions of electronic mail, and attachments thereto,

in order to determine whether their contents fall within the items to be seized as set forth herein; and/or

d.  performing keyword searches through all electronic mail and attachments thereto to determine whether occurrences of language contained in such electronic mail and attachments thereto exist that are likely to appear in the information to be seized described in Section II.

Within 14 DAYS of the issuance of this warrant, Provider shall deliver the information set forth above.  The Government will conduct a search of the information produced and determine which information is within the scope of the information to be seized specified in Section II of this attachment.  Law enforcement personnel will then seal any information that does not fall within the scope of Section II and will not further review the information absent an order of the Court.

# CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by Google LLC, and my title is _____. I am a custodian of records for Google LLC, and I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of Google LLC The attached records consist of:

_____

I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Google LLC, and they were made by Google LLC as a regular practice; and

b.      such records were generated by Google LLC's electronic process or system that produces an accurate result, to wit:

    1.      the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Google LLC in a manner to ensure that they are true duplicates of the original records; and

    2.      the process or system is regularly verified by Google LLC, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.


_____        _____
Date                           Signature

USAO File Number:    2023R01214    AUSA:    John K. Neal    Telephone:    (313) 226-9644
AO 93  (Rev. 11/13) Search and Seizure Warrant    Special Agent:    George Adams    Telephone:    (202) 860-8679

# UNITED STATES DISTRICT COURT
for the
Eastern District of Michigan

In the Matter of the Search of    )
*(Briefly describe the property to be searched*    )
*or identify the person by name and address)*    )    Case No.  -2
INFORMATION ASSOCIATED WITH TWO    )
ACCOUNTS STORED AT PREMISES CONTROLLED    )
BY GOOGLE LLC    )

Case: 4:23−mc−51569-2
Assigned To : Behm, F. Kay
Assign. Date : 10/31/2023
Description: RE: SEALED MATTER (EOB)

I hereby certify that the foregoing is a certified copy
of the original on file in this office.
**Clerk, U.S. District Court**
**Eastern District of Michigan**
By:   s/Eddrey Butts
Deputy

## SEARCH AND SEIZURE WARRANT

To:    Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search
of the following person or property located in the _____ Eastern _____ District of _____ Michigan _____ .
*(identify the person or describe the property to be searched and give its location)*:

See ATTACHMENT A-2.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property
described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See ATTACHMENT B-1.

**YOU ARE COMMANDED** to execute this warrant on or before    November 14, 2023    *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.    ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the
person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the
property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory
as required by law and promptly return this warrant and inventory to  the presiding United States Magistrate Judge on duty  .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C.
§ 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose
property, will be searched or seized *(check the appropriate box)*
☐ for ____ days *(not to exceed 30)*    ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:    10/31/2023    _____
*Judge's signature*

City and state:    Flint, MI    Curtis Ivy, Jr.,    U. S. Magistrate Judge
*Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.:<br>-2 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name of any person(s) seized: | | |

## Certification

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

 

_____
*Executing officer's signature*

_____
*Printed name and title*